Good morning, Your Honor. I'm John Aredo on behalf of the defendant and appellant, Male Jack Productions, Inc., referred to as MPI. This is a copyright case, as you all know, and it's a slightly unusual copyright case. There's no issue as to who owns the copyright in the work, which is entitled Richard Fryer Live in Concert. There's no issue as to whether Mr. Biller, the copyright owner, licensed the property to MPI through at least one agent that he didn't personally know who signed the license on behalf of the copyright owner. And that occurred during the first license that was granted in 1995. There's no issue as to whether... I'm sorry. I didn't catch what you said. You said there was no issue that he did authorize the first? Right. There's no issue as to whether he authorized the first license, which was signed by somebody that he didn't know. The issue is the extension of the first license. That's what we're worried about. Right. Right. There's no issue as to whether the licensee, MPI, exploited the license for seven years and sold many thousands of copies of the property for the benefit of the copyright owner as well as the benefit of itself. And there's no issue as to whether the licensee, MPI, asked the copyright owner's agent for a three-year extension of the license, which was approved by the agent and signed on behalf of the copyright owner by a second agent whom Mr. Biller did not personally know. So you've got similar situations in the two license situations. In the first instance, the license is signed by an agent of Mr. Biller whom he did not personally know at the time. And the second license is also signed by an agent of Mr. Biller who he did not personally know at that particular point in time. The issue is whether... Well, let me go back and summarize the facts because I think they're a little bit complicated. In the 1980s, Mr. Biller was the copyright owner of this property called Richard Pryor Live in Concert, which became a fairly successful sort of a cult movie. It's a movie of a comedy concert that Mr. Pryor did out here in California, I believe, sometime. At that time, Mr. Biller employed somebody named Joe Emerson who was an agent to rep the movie and try and get some deals for him. Emerson, in turn, employed a sub-agent named Art Greenfield who was more experienced in repping the movie for the types of deals that Mr. Biller was looking for. Mr. Biller did not know Mr. Greenfield. Mr. Biller operated under a practice of never entering into a written agency agreement with any of the agents that were repping any of his properties or repping this property, let's say. So Mr. Biller has Mr. Emerson, Mr. Emerson has Mr. Greenfield. Sometime in 1995, MPI, which is a home video company in Chicago, was interested in getting a license to distribute and exploit this Richard Pryor Live in Concert property. So it contacted an agent with whom it had worked, a movie agent out here named Steve Rogers. Let me ask you a question. You know, we've pretty much read all this stuff. So I want to fast-forward to what proof was offered to the district judge that the Rogers organization had the authority to act for Biller? Proof? The way the proof that was offered is... As to the extension, of course.  As to the extension. Well, I think the issue is there's a fact issue here. We, Biller contends, pardon me, Steve Rogers contends that he went to Greenfield and asked for approval to grant the extension. Greenfield took a... With regard to the extension, right? Or was there anybody? Well, the Greenfield... You have nothing in writing or orally showing that Biller approved the extension. Is that right? No. We have Biller, we have Steve Rogers approaching Greenfield and asking for... I know. Right. And Greenfield was Biller's agent. Biller says he's never heard of Peter Rogers' organization. He never heard of him at that point in time. Before, yeah, before this. But he never heard of Greenfield at the point in time... Well, he may not have heard of a lot of people, but, I mean, he says he never heard of Peter Rogers. Right. What contradicts that? Nothing contradicts that. All right. Is there anything to... We don't, we're not saying that he heard of them. All right. Is there anything to show that Biller authorized Greenfield? Yes. Why? Well, first of all, there's testimony from Mr. Rogers that Biller said, it's okay, go ahead and... Biller? Not Biller. Greenfield. There's testimony from Mr. Rogers that Greenfield said, okay, go ahead. Okay. All right. Grant the license and sign it. Okay, fine. There's a letter that Mr. Biller wrote. And the letter seems to say the opposite. If it says anything, it says don't do anything. No. The letter is ambiguous. It could refer, if you look at the letter, it says don't do anything more. Well, it certainly doesn't authorize him to do anything. I mean, if it's ambiguity, I don't think it's all that ambiguous. But even if it were ambiguous, the only thing it might do is reflect that he now knows that he's agreed to an extension, which I don't think it does. But even if it did that, it still wouldn't authorize the extension. No, it wouldn't authorize the extension. What it demonstrates, the problem we have here is that the only one that's still alive is Biller. These other guys are dead. Okay? Rogers isn't dead, right? No, Rogers isn't dead. So we have to look and see what Biller did. Biller writes a letter. I mean, doesn't this coincidence strike you that this is the very same day, October 11th, 1996, he writes this letter, the same day that Rogers takes the deal to Greenfield and Greenfield presumably takes it to Biller, the same day he writes the letter and he has a conversation. And what inference would you draw from that? Pardon me? What is the exact inference you would draw from that? The inference I would draw is that it's most likely that because these things happened the same day. This is right when Emerson died, right? This is after Emerson died. Right when he died. I think he had died substantially earlier in the year, sometime in 1996, I think. This happened in October of 1996. The inference I would draw is that there was a conversation that day between Greenfield and Biller, and Biller approved the license and then decided, I don't want this guy running around doing any more deals for me with this property. So he wrote the letter and said, okay. Other than the deal with the deal. And he approved the license. Why is that an inference from the fact that he said, don't do it? Because we've got Mr. Rogers' testimony saying that he went to Greenfield. Greenfield said, okay, I'll get back to you. He came back and said, yes, okay, you go ahead and sign it. And Greenfield was Biller's agent. Greenfield signed the first license. He's Biller's agent. Well, he was asked for the first license. Yeah. I mean, the coincidence of October 11th is pretty striking. I mean, it suggests either sort of a conspiracy against Mr. Biller or it could suggest something along the lines that you're suggesting. Is there any evidence as to what time of day either the extension was signed or the conversation was had between Mr. Greenfield and Mr. Biller? Well, I think that the evidence is that the letter went out after Mr. Greenfield got back to Mr. Biller. That's my recollection. The letter to Greenfield from Biller? Right. Okay, no. What time was the extension signed? The extension was signed on October 11th. Is that right? I don't know that, Your Honor. I don't know what time the extension was signed. So for all we know, it could have been signed earlier in the morning and Greenfield is just blowing smoke on his conversation with Biller. And we just have no idea, right? Greenfield might know full well when he's talking with Biller. Biller says, I don't want you to do anything. I don't want you to do anything. And Greenfield is thinking to himself, crud, I just signed this extension this morning. This is a really horrible coincidence, but it doesn't say anything to Biller. Well, he didn't sign the extension. He just got back to Rogers and said, it's okay, sign it. I mean, if he was going to do that, it seems to me. And Rogers signs it on the 11th, which suggests then that Greenfield had approved it prior to the 11th. No, he approved it the same day, the 11th. Everything happens on the 11th. What's striking about this is it's the same way that the first license got signed, and Biller had no problem with that. All of a sudden, he has a problem with the second license. He also accepts the royalties for a period of over a year into the second term. That's what explains he had no idea that it was coming. He thought it was still coming off the first one. That's his explanation. This case, of all cases, of many cases that I've seen, cries out for a jury to take all of these facts and decide what happened. You've got to get Mr. Biller's testimony. Somebody's got to look at him and establish his credibility. He's the only one left. You've got to look at the letter that we talked about. There's an ambiguity there. The handwritten notes, there's an ambiguity there. The jury should decide this. The Court doesn't decide these issues on summary judgment. What is the ambiguity in the handwritten note? Pardon me? What is the ambiguity in the handwritten note? It's the same because it's the same kind of language that appears in the letter. Don't want Greenfield running around and making any more deals or something like that. It's the same ambiguity. Is he talking about the first deal? Is he talking about the second deal? Or is he talking about the whole ten years? That's the issue. You can't decide these issues on summary judgment. There are inferences to be drawn. They should be drawn against Biller. Thank you very much, Mr. Arrato. Good morning. Good morning, Your Honor. May it please the Court. Peter Anderson for Mr. Biller. Just to correct a few statements, counsel had said that Mr. Biller accepted royalties for a year. What the evidence was, the evidence was that the royalty statements, because they went through several different people, came to Mr. Biller late. He actually received a royalty under the purported extension on April 23rd. In May, within a month, he was told by Peter Rogers that Peter Rogers thought that there was — excuse me, Stephen Rogers — that Stephen Rogers thought there had been an extension, and Mr. Biller said, no, there hadn't. And in June, Mr. Rogers showed Mr. Biller the purported extension, and Mr. Biller immediately objected to it. That is the testimony from both Mr. Rogers and Mr. Biller. So as far as accepting royalties, we're talking about a period of less than two months before there was an objection. There was no evidence of any communication between Greenfield and Biller regarding the extension. There was no conversation — no evidence of any conversation between them on October 11th or any time around that. There is, in fact, both testimony and documentary evidence that there was no communication between Greenfield and Biller. There is a contemporaneous handwritten note that is not ambiguous that clearly says that Mr. Biller received a message from either Greenfield or Greenfield's bookkeeper about a payment being held by Mr. Emerson's estate. Now, that — so we've got documentary evidence of the handwritten notes. We've got the letter from Mr. Biller to Mr. Greenfield, which refers to no communication, no conversation between them, and even introduces Mr. Biller to Mr. Greenfield, which he would not have had to do if he had actually spoken. As far as the coincidence, and that's really what MPI is left with, this argument that everything happens on October 11th. Well, the notes indicate that it's a little bit of a broader time period than that. The notes indicate that — and the testimony is that the message came in — excuse me. The note is dated October 11th. The testimony is that that message was received that day or a day before. Mr. Rogers' testimony is that he didn't get around to signing the extension until, I believe, the 16th and then re-signed it on the 22nd for some reason that even he couldn't explain. As far as if one looks to the evidence as to why these things happened, then I think the coincidence evaporates. Mr. Biller wrote on October 11th because he received a message that the estate was holding more payments. That was shortly after the quarter ended, at September 30th. So in October, a new — a message comes from Greenfield that Greenfield had received a payment, and it was going to send it over to the estate. Mr. Biller objected to that and decided to write a letter objecting to it. On the other hand, you've got MPI interested in an extension shortly after the quarter ends. There was testimony of trial by Mr. Ali that it took about a year for them to gear up and actually start selling something when they got a license. So if the original license is back in 1995, a year goes by, the quarter comes up, he sees there's money coming in. The coincidence is because the quarter ended. The quarter ended, and that caused Greenfield to receive money, which he was going to send over to the estate, which triggered the Biller letter. The quarter ended. That caused MPI to be interested in an extension. I wonder if I could shift gears for a second and ask you to talk about the cross appeal, the way the damage, the deductible expenses were allowed. Allowed and definitely not calculated. What stops the district judge in his discretion from saying the guy gets on the stand, he says he knows what it costs to duplicate a tape, you know, he's established his credentials, you know, he can express his opinion, which the judge can accept or reject? Well, first of all, it was an opinion, and there were no expert designations either as a retained or non-expert designation, which was one of the objections I made. I mean, I could ask you, you know, do you know approximately what it costs to buy a gallon of gas these days? You know, that's the kind of thing that people who drive cars could be expected to know. You don't have to be an expert. Why isn't a guy in the movie business who duplicates tapes not able to say it costs two bucks, two and a half bucks to duplicate a tape? This court in Frank Music reversed the case where the defendant came in,  allocation. That was a pretty complicated case involving trying to allocate MGM's overhead to a particular motion picture and stage production. This is pretty easy stuff. What does it cost to duplicate a tape? Well, that was only one of the expenses. One of the expenses was general marketing and advertising, which is exactly the same thing that the defendant in Frank tried to allocate. Now, their numbers were bigger. There's no doubt about that. But the issues are the same. In Frank Music, the defendant came in and said, I have an allocation. I've given you the documents, and I'm allocating it on the basis of revenue. I'm allocating advertising and marketing expenses on the basis of revenue. And this Court reversed and said, because you didn't do enough. If that was the exact objection made at trial before Judge Otero, was it that these voluminous documents were reflected on a chart, or was it the best evidence was not presented, or, you know, what exactly was the objection? There was a series of objections, Your Honor. We had an hour-and-a-half hearing in the morning where the judge concluded that the documents had been withheld. The objections included that it was a summary for which, under 1006, that the underlying documents had not been produced. There was testimony by Mr. Ali that although his estimate was based in part on what his general knowledge of the industry was, that from time to time, and this was elicited on direct by Mr. Hart, from time to time he would confirm that by looking at documents. None of those documents were ever produced. Kagan. Yeah. There was also a discovery dispute. Well, I was going to say, Your Honor, as an initial disclosure issue, they were supposed to disclose the documents, or at least identify the documents that they were going to use to establish their costs, which is their burden. And so they had the automatic preclusion by not making any initial disclosures on costs. Third, we had specifically asked in discovery for cost documentation. The judge read the request into the record and asked counsel, did you produce anything, and it turned out, well, no. So they didn't produce any cost documents. But why isn't that the ultimate problem here? You didn't seem to push forward on the discovery issue. Well, Your Honor, first of all, the case law says we don't have to make a motion to compel. The Court has the authority and the ability to say if you don't respond to discovery, you can't use the documents at trial. But it didn't do that. I'm sorry? But it didn't do that. Well, it did, Your Honor. See, that's the unusual thing about this case. If you look at, I think it's page 138 of the transcript, the judge, you know, concludes everything, summarizes everything by saying there's got to be cost documents. You can't not have cost documents. You haven't produced anything. You have to be able to do an allocation. You haven't done anything. And then the court goes ahead and overrules the objection. Okay. That's what I meant. When the guy got on the stand and started to testify, what exactly was the objection made to the testimony? He's told us it was the voluminous document problem with the chart. I actually have raised, if memory serves, Your Honor, I've asked the judge, you know, I've objected to this before. Do I need to say it again? And he said, no, you have a continuing objection. So it was everything that was stated. As to the chart or as to the fact that they never produced the documents and therefore shouldn't be able to put something else on? As to the chart and as to Mr. Ali's testimony, given that it was we were precluded from obtaining any discovery, as to exactly what he was testifying to. He came in and said. Okay. And Judge Otero's answer to that was there aren't any documents? Yes. I'm just thinking of reminding you to finish that point. So we had all this evidence. We had Mr. Ali saying, I look at these documents to verify my estimates. Yes, we get invoices from all these people and the fulfillment houses. Yes, we have computer summaries for sales commissions. Yes, we have the revenue information where we could allocate it. But when push came to shove at the end, the judge said, he accepts that there are no documents behind the chart. There are no documents to produce. And so the. Well, there were no documents behind the chart because the chart. One of the problems here is that you and your papers got very hung up on this chart. The chart doesn't seem to have much to do with anything. The problem is that they didn't produce any documents to support the numbers that underlay the chart. Whether that was in the chart or whether there was no chart wouldn't have made any difference. But he got up there and testified as to how much it costs to produce a DVD. And although one knows that if they're ordering DVDs from somebody, they have to be bills going back and forth about X number of DVDs for Y price. That never showed up. Right. And you asked for it. We definitely asked for it. It's in the record. It wasn't produced. We also cited in our opening brief Nelson Salabi, which there's an automatic preclusion. Suppose we agree with you. What's the remedy? Well, the remedy, I believe, is to disallow, to remand it with erections, to disallow the expenses that were claimed. Or to do it over or to allow the discovery and do another trial. Your Honor, they had their chance. I mean, this is an instance, and we didn't lay in the weeds. I specifically, first of all, I called up Mr. Aredo and told him you can't, in the discovery part of it, when we got interrogatories that said $250 a unit, I said you can't do this. And if you do do this, that's up to you, but I'm going to object. We raised it then. We raised it before we had the deposition of Mr. Ali. In the deposition of Mr. Ali, I said there are ways of allocating, but you're not providing the information. Did you do these, did you do any of these allocations? And he very, I thought, honestly, he said, well, we really didn't give it much thought. I mean, that's the testimony from the man who gave the estimate is, well, we really didn't do much research. Now, on direct, he did say, well, we also look at the documents to support this from time to time. But to give them another shot, when we went through, and it is a relatively small case, but we went through discovery and they didn't produce it, they didn't produce it in initial disclosures. At trial, the judge gave them a chance. He ordered them to produce the documents and even said, obviously, this may mean an extension of the trial. And he ordered them to produce the documents. Mr. Hart at one point said, they're coming, they'll be here in the morning. And then he said, well, actually, we don't need them because the one exhibit will punt on. We won't use exhibit 107. And 108 doesn't have any documents behind it. Roberts. So does this basically boil down to this is a best evidence problem, that the best evidence of what it costs to duplicate the tape would be the invoices from the duplicating house, that sort of thing? Well, I suppose one could look at it that way. But part of the problem was that because we just got a chart and we were hearing there aren't any documents, yes, there are documents, we weren't able to look at the documents to determine whether they're even admissible. Now, it may be — It's a discovery problem. I'm sorry? It's essentially a discovery problem. No, I think it's both. It's the consequences of a refusal to produce the cost documents at trial, coupled with this Court's existing case law that says when the defendant comes in and tries to prove expenses, it has to provide a reasonably acceptable formula. That's the law of assertion. But why a trial? I mean, why isn't the real problem they didn't produce a broader range of things earlier from which you could have derived some numbers? Absolutely. And, in fact, we said that in the brief. If they had even produced the documents, then when Mr. Ali said, well, you know, I think it's $250,000, then we could have said, well, wait a second, your invoices that you gave us showed you you spent, you know, a million for a million units. That's a dollar per unit. Why are you saying $250,000? But we were precluded from doing that. You haven't really focused the argument in your brief on your refusal to produce discovery as such. You haven't said the judge should have ordered them to produce a discovery. That's not what you said. You kept talking about this chart. Well, you know, Your Honor, I think part of that is because this Court has also said that the burden isn't on the plaintiff to establish the cost. We have the luxury of being able to sit back and say you didn't do it right. No, but that's what I'm trying to isolate, and I think Judge Berzon is getting. You have to isolate what the problem with it is. Is it that he's not qualified to testify to what it costs to duplicate it? Is the problem that they didn't give you the documents in discovery? Is the problem that it violates the best evidence rule? You know, what is the problem you raised with the judge? It sounds to me I had the same view that Judge Berzon did. Your complaint was that they offered a voluminous document but didn't give you the underlying documents. Well, they offered a chart and didn't give us the underlying documents. We also raised that they hadn't produced them in initial disclosures, which creates an automatic preclusion, and there's no evidence of substantial justification to allow the judge to allow that in. 37C1 says that it's automatically precluded unless there's evidence of a substantial justification. There was no evidence of a substantial justification as to why they couldn't produce the documents, and there was – instead, they took the tackle, there really aren't any documents. And the Court, even though there was testimony that the documents existed, the Court made a finding that there weren't any documents. Roberts, Jr. Thank you very much, Mr. Hanson. Mr. Arado, we go back to you. We'll give you two minutes in rebuttal, please. Do you want to address the cost issue at all? Yes. You mean their appeal? Yeah. To a great extent, I want to stand on it, Ruth, because I think we dealt with it very specifically. The fact of the matter is there weren't the kind of documents that you normally see in this type of a situation because the license was based on our gross revenues. There was no incentive for us to keep track of costs. We just had to keep track of gross revenues in order to pay the licensor. But you order DVDs from somebody and you pay them something. Yeah. Right? So you have to have records about not these particular DVDs, but what you pay people to produce DVDs. You have to have those records. We don't have any records, though, that are specific to this title. That was the problem. Can you show what it was generally? That's what Mr. Ali did. Well, yeah. Mr. Ali comes in and just gives us a dollar. He just throws a dollar figure and says, well, it's $1,015. Well, I think it was more – it was a little bit more pointed in that if you look at the exchange, and it's in the brief, it's pretty clear that he's talking about his experience based upon what each title cost them in terms of replication, in terms of verification. They asked for documents. They were entitled to some documents in discovery that of the ordinary business kind, that ordinarily businesses have, when they pay people for doing things, like marketing, like DVDs, like, you know, producing widgets. And you produce nothing. And then you get some guy to stand up there who's completely uncorroborated by anything, saying what he estimates the number to be. And it is an awfully peculiar way to proceed, especially in a context in which there is some specially – unusually special obligation, to be precise. There was – Mr. Anderson talked about a conversation that he had with me, which isn't in the records, so let me just say. Before Mr. Ali's deposition, I checked with Mr. Anderson. I said to him, is there anything else that you need in order to take the deposition? The answer was no. As it came closer to trial, we got together some of these documents that you're talking about. They were in California on the morning of the trial. And the judge said, just let them decide. Let's just see where we are. Let's listen to the witness. And the witness testified, and the judge was satisfied with that. My main purpose, though, in being up here is please don't lose sight of the fact that this is a very important and, we think, critical summary judgment case. The judge decided all of the inferences, not in favor of the Respondent, but in favor of the movement. But inferences have to have some basis. Judge, somebody has to look – some trier effect has got to look at this letter and decide what does it mean in the context of the surrounding events. Somebody's got to put Mr. Biller on the stand and examine him and cross-examine him. What the letter says is that please do not make any distribution agreements for this that you've made with the MPI. So, he's only looking at one. He's not looking at two. So, from which would you get the reference that he's talking about an extension? The one – Rather than the one that he already did before. Judge, the one could mean the entire 10-year term. The deal you made with MPI, it's an exclusive license that would be talked about as one. Nothing else can be done until the MPI deal is over with. It's exactly the way Mr. Biller operated throughout the entire time. It isn't fair to let the copyright owner sit back, refuse to enter into written agency agreements with any of his agents, approve the agency – pardon me, approve the license through the agent, and then somewhere halfway through the license pull the plug on it. That's not the way it works. There was a writing that satisfied the copyright law. The writing was the license that was signed by the agent. Mr. Biller's actions and inactions have to be tested under state law. Was the agent duly authorized? That's what the copyright statute says has to occur. The writing has to be signed either by the copyright owner himself or by a duly authorized agent. And the only way to decide that is to give this case to a jury. Thank you very much, Mr. Arado.  The case argued is submitted. Good morning. Thank you. Next case is CR v. Boy Scouts of America. Each side will have 10 minutes.
judges: Silverman, Berzon, Bybee